No. 23,314.

THE STATE OF KANSAS, *Appellee,* v. ALBERT P. ALLEN, *Appellant.*

SYLLABUS BY THE COURT.

HOMICIDE—*Murder in Second Degree—No Error in Record of Conviction.* The record of a prosecution, conviction and judgment in a case of homicide, wherein the defendant and two confederates armed themselves with revolvers and guns and invaded the premises of a ranchman who was in the peaceable possession of a mule claimed by the defendant, and the incidents which attended their forcible recaption of the mule and culminated in the death of the ranchman at the hands of the defendant, examined, and no error discerned in the judgment rendered on the jury's verdict of murder in the second degree.

Appeal from Pawnee district court; ROSCOE WILSON, judge. Opinion filed April 8, 1922. Affirmed.

*Edgar Foster,* and *Horace J. Foster,* both of Garden City, for the appellant.

*Richard J. Hopkins,* attorney-general, *Clement L. Wilson, George L. Reid,* both of Tribune, *Carr W. Taylor,* of Hutchinson, and *Edwin D. McKeever,* of Topeka, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This is an appeal from a conviction and judgment in a case of homicide.

This deplorable affair arose over the possession of a mule in the custody of Joe Kuttler, a ranchman in Greeley county. Kuttler

notified the defendant, Albert P. Allen, by mail that he had a mule freshly marked with defendant's brand. Defendant lived on a ranch in Kearny county some forty miles away. Allen called on the sheriff to accompany him and they went to the Kuttler ranch to see the mule, and Allen claimed it as his, and that he had raised it. Kuttler likewise claimed it. Some days later, on May 24, 1918, the defendant and his brother John and a neighbor, William Thompson, armed themselves with revolvers and guns and set out for Kuttler's ranch to recover the mule. They stayed that night at a neighbor's place, and the following morning they arrived at Kuttler's ranch, the defendant on horseback, and his brother and Thompson in a car. Defendant's evidence is that John Allen asked Kuttler if they could look at the mule and that Kuttler said, "Yes, you can look at her all you want to." Defendant caught the mule in a corral, put a rope around her neck, and led her to where Kuttler and John Allen were standing. John examined the mule, and said it was their property and that they would like to get her. Kuttler, according to defendant's evidence, said: "You will play hell getting it." He closed the gate, and called for the assistance of his wife. When she came out of the house, Thompson covered her with a gun and told her not to come another step. Thompson then turned the gun on Kuttler. He was in the corral, as also were the Allen brothers and they had guns in their hands. Kuttler was apparently a man of undaunted courage, and although he had no firearms he faced and fought his armed assailants with such weapons as he could pick up, first a two-by-four stick, then a piece of fence post, and eventually he got a hold of a piece of gas pipe, and with these makeshift weapons he confronted first one and then another of his opponents, all of whom alternately and sometimes altogether levelled their guns at him and threatened to shoot him. Kuttler's wife and two daughters, girls of twenty-two years and sixteen years respectively, were witnesses to most of the incidents leading up to the tragedy. They endeavored to assist Kuttler in keeping the corral gate shut so that the ruffians could not make off with the mule. The defendant laid violent hands on Mrs. Kuttler and badly wrenched and injured her arm. She testified:

"When I got back to the corral, my husband was standing in the corral some distance back; the mule was down near the gate, which was open about four feet, and Albert Allen had hold of the halter. My husband told me not to let them take the mule out. I would pull the gate shut and they would pull it open. I saw I could not hold it shut myself, so I called my daughter

Virginia and together we pulled it shut; but the Allens would pull it open, so finally my other daughter, Chiona, came out. While we were struggling with the gate Albert Allen reached over the fence and took hold of my left arm and wrenched it. It hurt awful bad, and I screamed and said, 'Let loose; you will break my arm.' My daughter took his hand off my arm. My arm was very sore and black and blue for several days. Kuttler told me to wire the gate shut. I told Chiona to bring me some wire and I wired it shut. Albert Allen picked up a piece of timber lying in the corral and tried to break the gate down by striking it with the timber. John Allen was holding a gun on Kuttler and Thompson was also holding a gun on Kuttler. . . . John Allen struck Kuttler with a revolver over the head. Kuttler staggered back and got away from John and Albert Allen a little and picked up the gas pipe; that was the first time he had that gas pipe in his hands. He drew the gas pipe as if to strike the two Allen boys, who were crowding him. They did not come any closer, and I said, 'Don't strike, Joe; they will kill you if you do', and he lowered the gas pipe. When he lowered the gas pipe John Allen went out of the corral, went around to the west side. Albert Allen backed up towards the northwest corner of the corral, where he had the mule. He stood between the mule and Kuttler and kept his gun drawn on Kuttler. Up to that time I had not had any conversation with John Allen. Albert Allen said to Kuttler, 'God damn you, I am going to shoot you.' There had been no shots fired. Albert Allen fired two shots. Kuttler called to the girls, 'Stay with him, girls; I am not hurt yet.' John Allen came on the south side of the corral, and as he went past he said, 'We have come to kill him and we are going to kill him.' I said, 'What good will that be, to kill him? That will wreck two homes; it would sure wreck two homes and send you to the pen.' And he said, 'That is the place to go to get rich.' . . . After the two shots Kuttler backed off, away from Albert Allen; his face was towards him, but he backed around a little to the southeast, and when he was about in the center of the corral he threw his gas pipe down and ran over to the southwest corner of the corral to the cattle chute. After Kuttler threw down his gas pipe he ran to the southwest part of the corral toward the dehorning chute and raised his foot as if to climb over or get into the chute. Then Thompson hollered, 'Shoot, Albert, shoot.' Before that, I heard him say to Virginia, 'Little girl, we don't want to kill your father, but we are going to kill him.' When Thompson said, 'Shoot, Albert, shoot,' Albert shot him. Kuttler was right at the chute; he turned and ran east and Allen shot again, and Kuttler fell. . . . He was about twenty-five or thirty feet from Kuttler. When Albert fired the third shot Kuttler turned and ran and fell about three feet from the gate. There were four shots altogether. When the fourth shot was fired, Kuttler said, 'Mother, he has killed me.' The girls and I unwired the gate and went into the corral. . . . The girls and I went to Kuttler. We helped him up and helped him walk to the gate, and as he was walking out of the gate he said, 'Don't let them take the mule.' Albert Allen led the mule from the lot and took him away."

Virginia Kuttler testified:

"When Albert Allen fired the last shot . . . I heard father say, 'Mother, that has killed me.' We went into the pen and father was down on his knees

and had one arm up. He was . . . about twenty or twenty-five feet from Albert Allen when he fired the last shot. The gas pipe was lying close to the chute over to the southwest corner of the pen, about ten or fifteen feet from where father was on his knees."

Chiona Kuttler testified:

"When I came out of the house for the last time from phoning [to the sheriff] I heard Thompson say, 'Shoot, Albert, shoot.' . . . I looked in the pen and father was going from the chute towards mamma, . . . I seen father. He went almost in a run over to the chute and put his foot up as though he would climb through the chute and get out before Albert Allen shot again, and he started then over to the southeast corner of the pen, where mother was standing. He got about half way across the corral, but the shot was fired and he fell. Thompson made the statement with reference to that call to shoot just a little before the third shot. When the fourth shot was fired Albert Allen was facing the south. Father was running to the southeast corner of the pen, but all the time looking at Albert Allen. I was looking at father when he fell. Albert Allen was between twenty-five and thirty feet away from father when he fired the shot. As soon as father fell he got up on his right knee and hand and put his left hand to his side and called out, 'Oh, mother, he has killed me.' We went in and carried father out. Father did not have anything in his hand when the fourth shot was fired. When he started to run to the cattle chute he dropped the gas pipe. . . . The gas pipe was quite a ways from him."

According to defendant's evidence, one of the incidents of the affray was that Kuttler advanced upon defendant with the gas pipe. Defendant testified:

"I told him to stay back. He stopped and stepped back a trifle and we stood there some little time and then he kind of moved towards me and I stepped back and he had the gas pipe in his hands this way (indicates) ready to strike and I stepped back and Bill hollered at me. . . . I turned to look that way and Thompson, who was on the fence on the east side at that time, hollered to me to look out, Allen. I straightened up just in time to see him striking at me and I dodged. He struck at me or struck at the side of my head and I dodged down that way (indicates) and he missed me and when I straightened up I had my six shooter in my hand that way (indicates). I straightened up and I hit him in the side of the head with the six shooter right over the ear or just back of the ear. He throwed up his hand that way and it was bloody and he said, I am glad you did that, now I will kill you, you son of a bitch, and he got his gas pipe up then and came towards me and I took my six shooter up and warned him to stay back and he stepped back a minute."

There was a good deal of such maneuvering, advancing and retreating by both the assailed and the assailants, according to the evidence for defendant. Other excerpts from defendant's testimony read:

The State v. Allen.

"I glanced up just in time to see he struck at me the second time and then I shot the six shooter the two times on the ground and he missed me the second time. . . . He stepped back and stood in that position a little while and then he began to try to get close to me again. . . . I was not quick enough for him and when I looked up I saw I was too late to dodge him and get below his lick so I threw my hand up that way and he struck me on the arm and it glanced up that way and it broke the bone. The six shooter was discharged accidentally in the ground that time with the shock. . . . I stepped out away . . . I saw Mr. Kuttler coming back with the gas pipe in his hand again and I drew my six shooter again and hollered at him and said, Stop, don't come any nearer, and he did not stop and I then raised my six shooter and I said, don't come any nearer or I will have to shoot, and he kept coming and by that time he was about eight feet from me and I pulled the trigger. When he was coming towards me he had the gas pipe in his hands with his arms up that way (indicates) and this way, . . . I shot him because I thought it was time for me to protect myself. I shot him to stop him. . . .

"After I had discharged my gun, he stopped, dropped the gas pipe, put his hand up that way and hollered to his wife, Oh, Clara, he has killed me, he has shot me. . . . I was looking at him for some little time to see what he was going to do and he staggered back then and eased himself down on his hands part way; he did not fall clear to the ground. . . . My brother said, get the mule and we will go to Tribune and give ourselves up.

"I went and caught the mule. I put my six shooter in my scabbard and went to where the mule was. I got the mule and led her out and took the bridle rein off of the gate post and got on my horse. . . . I had some conversation with the county attorney [Mr. Wilson] on the Monday following. . . . I did not tell him that we went over there to get the mule even if we had to kill Kuttler. I told him that my brother and I went over there and tried to get the mule."

The state quotes some testimony on this last point. One of its witnesses to the interview between the county attorney and defendant testified:

"Mr. Wilson asked Mr. Allen where they stayed the night before they went to Mr. Kuttler's, and he said they stayed at Mr. Horning's . . . Mr. Wilson asked him if they went up to Kuttler's to get their mule, and he said they certainly did. He asked if they went up there to get it, even if they had to kill Mr. Kuttler, and he said they went there to get it even if they had to kill Mr. Kuttler to get it. He asked him what kind of a gun he had, if he had Horning's gun; and he said a 32-caliber Smith & Wesson automatic. Asked if he asked Mr. Horning for it, he answered he took it; did not ask Horning anything about it. Mr. Wilson asked him why he took it, and he said he thought they would need it. Mr. Wilson asked him if the other men were armed, and he said Thompson had a 30-30 Marlin rifle that belonged to his brother, and his brother, I think, carried a .38 Colt's automatic. The Smith & Wesson was double action."

Defendant was convicted of murder in the second degree and judgment was entered pursuant thereto. He appeals.

Examining the matters discussed in his brief, there is practically nothing suggested that looks like an error—scarcely a point worthy of discussion. He quotes an excerpt from our former opinion in this case, *The State v. Allen*, 107 Kan. 407, where we condemned an instruction which would have given countenance to a right on the part of defendant and his confederates in this affray to arm themselves and go to Kuttler's home and get the mule when they had reason to believe that such an adventure would bring on an altercation with the possible result of their slaying Kuttler to save themselves from violence at his hands. This court conceded:

"The Allens had a right to obtain possession of the mule, if it was theirs, if they could do so without committing a trespass or a breach of the peace." (p. 414.)

But it was likewise said:

"The evidence of the defendants tended to show that Kutler was a violent man; that he had made threats against the defendants; that they had information concerning those threats; that they armed themselves; that they went to Kutler's home; that they got into an altercation with him; that an encounter ensued which resulted in Kutler's death; and that they had reason to believe that their visit to Kutler's home would result in an altercation and a possible encounter in which it might be necessary for them, in self-defense, to take Kutler's life. They had no right to go to Kutler's home in that manner under those circumstances." (p. 415.)

It is suggested, however, that defendant was not a trespasser because Kuttler gave permission to examine the mule. But he was a trespasser when he undertook to unhobble the mule and to take it from Kuttler without his consent. They say that the testimony is undisputed that on the defendant's peaceable assertion of ownership the deceased began a deadly assault on defendant. There was a brief interval when no one except the defendant and his confederates and their victim were present, and their story as to the inception of the affray is the only direct testimony as to just how it did originate, but undisputed testimony may nevertheless be untrue, especially when it is self-serving, and furthermore this testimony was most persuasively disputed by all the circumstances. No sane man would immediately proceed to violence against three armed men on their mere assertion of ownership, having no weapons himself and none accessible except such stick or club as chance might put in his way. The deceased may have been a violent and quarrelsome man, but it

is hardly reasonable that he would become violent and dangerous on the mere peaceable assertion of ownership of the mule, for that assertion was nothing new to him; it did not take him by surprise; defendant had asserted ownership of the mule some days previously when he and the sheriff visited the Kuttler place; and, furthermore, Kuttler gave defendant a fair opportunity to assert peaceful ownership of the mule when he informed him by United States mail that he had such mule in his possession under claim of ownership. The circumstances tend strongly to show that, being there in armed force, the defendant and his confederates disclosed to Kuttler their determination to take the mule, but that he was not to be intimidated by their show of firearms, and that he boldly told them, "You will play hell getting it," and at once closed the corral gate and called for his wife's assistance. The interval before his wife's appearance was short, and when she arrived the defendant held the mule with one hand and he and his brother held their guns on Kuttler, and Thompson drew his gun on Mrs. Kuttler and told her not to come another step. She testified:

"I threw up my hands and said I was empty handed and I had only one time to die; to turn loose if he wanted to. I went on to the gate and he took down his gun; ceased pointing it on at me. Thompson then . . . turned the gun toward Kuttler in the corral."

Defendant complains of certain instructions, saying—

"As abstract statements of the law the instructions are probably correct, but not applicable to the facts. . . . There is no evidence that they went there with any intention of taking the mule by force or that they went there intending to provoke an assault."

We hold otherwise; the evidence inherent in the circumstances was almost wholly to the contrary. Why all this arming and show of guns and revolvers, and this carefully planned journey of forty miles—this second journey, this rendezvous at night at the home of Horning, and the requisition of Horning's gun to add to their already formidable arsenal? They were there to get the mule, to overawe, overpower or slay Joe Kuttler, if necessary to accomplish their purpose; and they did exactly what the circumstances indicated their intention to do.

As a final protest against the judgment defendant suggests that he has been unable to procure a transcript of the entire record, and that this was not through any fault of his. That does not call for a reversal of this case, notwithstanding the doctrine and citations of

counsel to that effect. Indeed, that is not a fair statement of the rule which they quote from 17 C. J. 164. That rule is:

"But if, by reason of a loss of the record, appellant is unable by no fault of his to perfect his appeal, he will be excused from producing the transcript and the judgment will be reversed. A reversal of a conviction is not required, however, because the entire record cannot be presented to the appellate court; but it is the duty of defendant to substitute the lost parts of the record by proper proceedings in the lower court."

Under our practice whatever part of the record has been lost or is otherwise inaccessible for presentation on appeal may be supplied by copies, substitution, or statement of contents, under the supervision of the trial judge. (Civ. Code, §§ 583, 755a, 755b, 755h; Crim. Code, § 282.) Furthermore, the missing part of the record had to do with the testimony of character witnesses, showing the prior peaceable disposition of the defendant and the turbulent propensities of the deceased. As no error is suggested touching these incidents it is altogether immaterial that such testimony is wanting. Indeed, defendant's mere statement in his abstract that such was the nature of the testimony, when the state does not care to contest its accuracy, is an abstract of it and answers every purpose of review, since there is no error based thereon.

The record discloses no reason for disturbing the judgment, and it is therefore affirmed.